Our final case today is Se-Kure Controls v. Diam USA. I say we find whoever is involved in passing that hash-wax man out and lynch him. Is that you? Let's lynch him right on the spot. Mr. Harris, are you ready to proceed? Yes, we are, Your Honor. You may. Thank you. Good afternoon, Your Honors, and may it please the Court, Counsel. In the lower court's opinion, the Court made it very clear at page 18 of the opinion that the plaintiff had shown, in its words, quote, considerable evidence that the invention had achieved success in the marketplace, unquote. Immediately after that, the Court proceeded to ignore not only commercial success, but also ignored long-felt and unsolved need, failure of others in the industry, massive copying by an entire industry, including Telefonics, which is the owner of the 805 patent, which wasn't mentioned by the Court, as well as ignored licensing to many, many in the marketplace. Let me ask you to throw aside for a moment the secondary considerations. I know you're going to want to argue that, and you'll have time to get to it. But my first question relates to the similarity between the prior ARC 805 patent. You said, oh, well, the 805 patent is different because the retraction mechanism was different, and so it wasn't obvious over the combination of the 098 and the 805, correct? That's correct, Your Honor. I looked back at your filing in the district court opposing some of the judgment, and it doesn't seem to me that you raised any argument about the different retraction mechanism. And I'd be happy to—I read it, but I don't see it there. Your Honor, before the district court—and I should mention, by the way, the retraction mechanism and the existence of the pawl and the ratchet was brought up not only in the reissue itself— No, no, no. I'm asking a specific question. With regard to the lower court, the experts looked at the structure on the wall with that slack loop that went into the outset. We don't raise the difference in the retraction mechanism in opposing summary judgment. The word ratchet does not appear. It did not before the lower court. That's correct, Your Honor. It's throughout three separate locations during the reissue examination, but that word ratchet and pawl, those words did not appear. So you're making a new argument here on appeal that you didn't make in the district court. That's not exactly accurate, Your Honor. With regard to what occurred in the district court, the experts who did look at it, people of skill in the art, of which there were only on plaintiff's side, looked at it and said, look, this is for telephones and only for telephones. It took a look at the wall mount, the position of the jack, and the outset. I understand the wall mount point. I'm asking about the retraction mechanism. There was no issue made about the retraction mechanism in the 805 patent being different from the retraction mechanism here when you argued this case on summary judgment before the district court, correct? That's correct, Your Honor. Okay. That is correct. With regard to that, by the way, on that very issue, what is argued is not only that it doesn't operate like the alarm system embodiment operates, without mentioning the ratchet and the paw. It's also mentioned that the 805 patent is limited strictly and exclusively to use with handsets and telephones, the actual cords and the operation. Now, we mentioned in the brief the fact that there was jamming on it. It had problems with telephones and the like. But the fact of the matter is it doesn't go anywhere near, even remotely, into the subject matter of alarm systems and the like. We do mention the fact that, frankly, with regard to the ratchet mechanism and the paw, those features that do exist there, those particular features would make the 590 patent completely inoperable. Under the DePue Medtronic's case, it's incapable of enabling its operation. Likewise, if you wanted to alter the 805 reference to enable its combination for an alarm system, you would make the 805 reference inoperable. Because what's happening with that ratchet and paw is the extension of a cord that is a cord that requires wire management. It's just sticking out. It's not being recoiled. As a result, and particularly what's shown at Appendix 1286, Figure 2 of the 590 patent, you could see at a glance that that's the exact kind of thing that's avoided by the 590, which does address alarm system criteria. And the examiner had a few things to say on ratchet mechanisms and the like. But in essence, that's an important distinction in terms of relying or not being able to rely on the 805. Your Honor, can I go into the secondary considerations at this point with the Court's permission? Doesn't the patent expressly reference phone cords? It uses, in this particular industry, Judge, it's bellwife. When it references phone cords, it's talking about good old standard 3-4 conductor bellwire, which happens in every industry in this country, to be very, very inexpensive. So if you're one of skill in the art and you're dealing with just wires and you're trying to retract them, why aren't you going to look at this telephone prior art? It looks to me like you'd be directed exactly to things that use cords, like phones, and directly to things that retract, like phones. That's an important issue, Judge. Please. Your Honor, in this particular case, the 805 patent refers to a retractor recoiler for a telephone extension cord. In reality, when that patent attempted to get a reissue, the patent examiner came back and said, the reissue examiner came back and said, look, you forgot the quotes around the word telephone. These are for telephones. And that's the be-all and end-all of the 805 patent. During its prosecution, they talked about success and interest in the product. Every one of them was with a telephone company. And for that reason, the fact that a whole bunch of industries' computers use telephone cords, that doesn't suggest for a moment that Internet methods and the like are necessarily going to be obviated because something that happens to be in the telephone industry, because they share that one station. No, but I've got a mouse with a retractable cord on it that winds up exactly the way this does. Why wouldn't, even in the computer industry, if you're retracting a cord, why don't you look at a spring and pulley system? Your Honor, there would be, and this is what's actually supported by the record, there was no suggestion whatsoever for any of those skilled in the art, and they were all, again, appearing for plaintiff, to combine a telephone retractor with a device that's integrated into an alarm system. It's as easy as that. It took two and a half years to go from the concept through plywood prototypes with huge constant force springs and the like to finally achieve what the invention was in this particular case. I thought the record was that there was no testing. Oh, there was testing, Your Honor. That's what defendants claimed in their brief, there was no testing. If you look at the Passantino Declaration, and I can identify that as A1558 through A1565, you'll see that it took two and a half years and a lot of failure to achieve what finally worked, and as soon as it came out, was adopted quickly by both the likes of Walmart and OfficeMax, where they displaced their entire alarm system setups. Very important point. There was a lot of testing, a lot of work that went into it, going all the way back to 1991, 1992. The product wasn't released until approximately January of 1994. With that, I would like to address the issue of evidence on the secondary considerations. What's the nexus for something like commercial success? The nexus, there's at least three or four occurrences of nexus. The nexus that's actually mentioned by Mr. Passantino, by Mr. Kuhn, actually by Mr. Kuhn twice. He had given a testimony at a hearing in a companion case before Judge Anderson. They all mentioned what the nexus was. What made this popular is the fact that it worked, that it actually worked, because until that point in time, there was actually a contest at OfficeMax where they went to three separate companies and asked them, look, someone's got to manage this tangle. Even with the curly cords, there was tangle everywhere, and there was only one company that came through and over the course of years came up with a solution to it, and when it worked, it was immediately adopted. You've seen reference to this particular invention in a book on the evolution of security in mass merchandising. It worked, and it was well recognized across the board. The problem with nexus is not so much whether or not there was nexus, but as the Court explained, whether there was a nexus that was addressed to the merits of the distinction between the invention and what occurred when you combined the 805 reference and the 098. In essence, the Court basically said that there's—the Court created an argument, an argument that couldn't succeed, a circular argument, where if the entirety of an invention is made obvious by the combination of two references, you could only have a nexus if it addressed the distinctions between the invention and what the combination of references showed, and the Court went on to say in this particular case, there is no merit. There is no distinction. There's nothing left after you put these two references together, the 098 and the 805, and the Court determined that it couldn't extend the nexus to anything that distinguished over the combination. As a rule, there was none. There was nothing that distinguished over the combination, completely contrary to custom accessories, to Grampy-Deer, Ortho McNeil, and the recent Crocs case. The Court was able to ignore every objective piece of evidence with regard to those secondary considerations. Instead, the Court went ahead and cited the Rothman case for the proposition, Rothman v. Target, for the proposition that if I've come up and I've employed three of the four criteria of Grampy-Deer, I've got the scope and contents of the prior art, what the ordinary skill in the art is and what the differences are. If I employ those and I find a prima facie case of obviousness, I don't even have to address the secondary considerations. And if you go to the Rothman case, that's not at all what the Rothman case says. What Rothman says is that the jury has to be instructed. You're spending a lot of time on secondary considerations. Does that suggest that you agree that absent the secondary considerations, you'd lose this case? I don't believe so, Your Honor. Why not? Because I'm very familiar with the product. I'm very familiar with what this patentee did over the years. And frankly, that distinction— I'm not asking about your familiarity. I'm asking why we should conclude that it was not obvious, putting aside the secondary considerations. Your Honor, I realize that this Court reviews these decisions de novo across the board, and I understand that. And the fact of the matter is, is the distinctions, the inoperability of attempting to combine the 805 with the 098 makes it clear. The prior art does not enable the successful operation of the product. It makes it incapable of working. And when you realize that the— Why is that? Because of the ranch and the pawl, amongst other things. The thing you didn't argue, okay. The ranch and the pawl is a significant operating feature that can't be ignored. It simply doesn't work in an attempt to do it. And that's one of the reasons why those in the art who were looking at this never thought even twice about combining an air phone recoiler off the back of an airplane seat with an 098 alarm system. Do you want to save your rebuttal time? I do, Your Honor. Thank you. With what little you have remaining. Thank you, Mr. Harris. Mr. Grossman. Good afternoon. May it please the Court. Your Honor, this ratchet issue which came up on appeal in the 805 patent, page 6 of our brief, it shows the ratchet. It's one screw and two pieces of plastic. It's on the left side of the figure. It's the last piece that's put onto the reel during assembly. And it doesn't have to be put on. Matter of fact, the company who makes this product quite often doesn't put it on. They make it for the airlines. If you're in the exit row, you're not allowed to have slack. So they just don't put on the pawl mechanism. That's it. And then you don't have slack. And this KSR holds, one skill in the art. Is that on the record about the exit row? No, it's not. This KSR holds, one skill in the art. Can make variations of the prior art, even from a different field. One skill in the art who wants a retraction of a cord, continuous retraction. Upon reading Burke, who no, just don't put the ratchet pawl mechanism into one screw and you'll have it. Also, it only goes to one of the clients, claim 12. The other claims don't require, of the 590 patent, don't require a ratchet. It's only ratchet pawl, it's only claim 12 of the secure 590 patent. Turning to secondary considerations just for a moment. Is what the district court said, 821, really what the law is? It seems he excluded, he says, since I've already found there's no genuine issue, and 98 and 805 are prior art patents, the combined yield disinvention. Then you're going to have to show commercial success with the nexus towards something other than what appears in the 98 and 805. Am I reading what he said correctly? You're reading the word, what the district court said. Is that right? I don't think that is correct. So what are we supposed to do with that, if it's not correct? Here's what we do with it. Under KSR, if the prior art results in a claimed invention, which it does, the 098 and 805 results in a claimed invention. Every element of the claims. And there was a reason to combine them. Which there was a reason, because the customers were saying, we're tired of the sloppy displays. And they had predictable results. Which is, up until today, was uncontested. There is not a testing document. Mr. Pasatino, the vice president, gave a declaration, but there is not one engineering document which shows any testing whatsoever was required. Under those undisputed facts, KSR says, summary judgment. And obviousness is apparent from that, those undisputed facts. Then summary judgment is appropriate. The secondary considerations are given little, if any way. So regardless of the secondary considerations, because of the undisputed facts, the fact that the summary judgment is appropriate. Now, regarding the nexus, your honor, they do have to show, SECURE does have to show that the commercial success was a result of the recoil. And that is totally absent. It could have been due to the explosion in sales of digital cameras at the big box stores. Now all of a sudden, there's a lot of cameras there, and because of that, there's a lot of sales. So they've shown an increase in their sales. We're at summary judgment. Aren't inferences supposed to go for that? They didn't show an increase in their sales, your honor. They showed an increase in your sales. Oh, in our sales. They didn't. What they showed, it would if the evidence was there, but all they showed... No, but they showed an increase in your sales, right? They did not. No? All they did was say we sold, like, $100 million, and that's a lot. But all they relied upon was the total sales of our company. They didn't say of the $100 million, $80 million were of the infringing... I thought they were saying that $30 million was the infringing thing. $30 million. Okay, but I didn't... They never broke... They relied on Mr. Lefkoe, the expert report. I thought they broke it down so there was $30 million of this device. No? I mean... Okay. I don't think so, but even if they... Let's say they did. If they did, they'd still have to show that how many other security devices did we sell. Some with the coil wire, which we did because customers want it. Walmart has enough. They have to show that the sales, the large amount of sales, is because customers were preferring that recoiler over the coil cords across the board. And just because one customer prefers one type of retraction device, one company prefers another retraction device, does not equate him to the nexus of commercial success for the patented invention. Mr. Layden of Secure Controls testified that he still sells coil cords. What's your attack on long-felt need or failure of others? A couple. What's the lack of nexus there? The lack of nexus in the long-felt need, again, would be it's totally subjective. It was provided by Mr. Kuhn and Mr. DiLeonardo. Undocumented, conclusory statements by interested parties. There's not a single document supporting these statements. And if that is sufficient to defeat a summary judgment for obviousness, there will never be a summary judgment for obviousness. They can say it. Where is the support for it? Where is the data for it to make it objective? It's not objective. So what is an example of that, that 1,400 people we sent it to had complained that there were all these cords that were making a mess all over the place? Is that what kind of evidence you're saying? I think it would come a couple different ways. One, I think there would be some documents saying, hey, these displays aren't good. We need some better product. We're having problems with entanglement. We're having problems. But you have some of that testimony from the OfficeMax, Mr. Kuhn, and then you have uncontested evidence that it took several years to develop this and that there was a need in the industry for this kind of security device. All from Mr. Kuhn and Mr. DiLonardo. None of that support about it. Well, the length of time actually comes from declarations of the secure president, right? Vice President of Operations, Mr. Passantino. So now we're starting to mount up a lot of evidence that there was a time delay and the need that might have been long felt need. Again, the evidence is not effective. It's self-absorbing from officers of the company. That's one. Two is the Q&A affidavit is a big problem. Did you rebut any of that? Did you say, oh, no, there's no need? No, because you're selling the same thing. It's a little difficult for you to say there's no need for your own products. We sell both products, coil cords. But the point is you're attacking this evidence as subjective, but it's unrebutted. Well, it's Mr. Kuhn. But under KSR, it's got to be given little because of the undisputed facts, little of any weight. Mr. Kuhn previously provided an affidavit which may be patent invalid by non-sale. So then he has numerous telephone conversations or face-to-face meetings with secured Mr. Passantino, who then recollects that, oh, yeah, of these facts from nine years earlier, we got this in June of 94, not October of 1992, to clear up the on-sale issue. A witness who can flip like that based upon conversations with the patentee is, I think that raises a lot of problems with that evidence to begin with. Even with KSR, it's supposed to be not given a lot of weight. With the additional facts of how that second declaration came, I think it's given even less weight. The point, an important point, Your Honor, is Paul Burke of Telefonics was selling these recoilers, their prior recoilers, 805 patent. It's also the prior 396 patent. He's selling them for use back then. The 198 patent is prior art. So by enforcing the 590 patent, by enforcing it, you're preventing Mr. Burke of Telefonics from selling his prior art recoiler to be used with a prior art alarm system. KSR states that doing that hinders using the full value of inventions, which actually, the exact words is, it deprives prior inventions of their full utility and it diminishes inventions. And that's exactly what's going on here. Mr. Burke should be able to use his prior art recoiler in any environment he wants. So, if Your Honor has any other questions. Thank you, Mr. Grossman. Mr. Harris, you have just about four minutes. Thank you, Your Honor. No, just about two minutes, less than two minutes. Excuse me. I'll make it brief then. Your Honor, I think it's pretty telling that Mr. Burke, who's the inventor of the 805 reference and the owner, the president of Telefonics, went into alarm mass merchandise security in 1995, approximately a year after Secure introduced its system into the marketplace. The company that was making this recoiler that supposedly had a lot of significance to the alarm industry didn't think of it until after Secure went in. With regard to unfelt need, Mr. Kuhn is not an officer of Secure. Mr. Kuhn was a customer who was kind enough to simply tell the truth and put out, swear out a declaration with his observations of what the prior art were. He had been in the security industry, not for five years, which is the level of ordinary skill that everybody's agreed upon, but for 25 years. He knew this. He's the one who put together the contest and asked two other competitors to come in with a solution. No one did except Secure. With regard to the numbers that the court referred to, the numbers were very close, as you, Your Honor, felt. It was $30 million in sales from Secure, $28 million in sales from Telefonics, and the collective other four or five infringers who have since settled and endorsed the patent by way of their license agreements were an additional approximately $40 million. But do we know it was sales of this product? Because without going into the details of the license agreement, we know exactly what they were sales of. We had actual sales of the recoiler units, the recoiler systems, and under the license agreements we get additional information for base payment of a royalty. We have objective evidence as to what the sales are, and that's how Mr. Levko, the damages expert, came up with his numbers. He had those physical numbers in his report. Finally, Mr. Grossman referred to the fact that it's very easy to simply go into the 805 patent and remove that ratchet and pawl, and then it could be something different. But the fact of the matter is, is the ratchet and pawl is absolutely crucial to that patent. It's in every one of the 15 claims. It's in every one of the descriptions. In fact, it was utilized to distinguish it from anything even close. It is an absolute necessity for the device to work. Otherwise, you're talking about talking on the phone with having something pull on your arm or having a telephone on a table that slides off because it's under constant bias. Thank you, Mr. Harris. Thank you. All rise.